THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT McLAURIN, Appellant.

First Department, February 10, 1977

*Carol Berkman* of counsel *(William E. Hellerstein* and *William J. Gallagher,* attorneys), for appellant.

*Richard M. Seltzer* of counsel *(Peter L. Zimroth* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

LUPIANO, J. A hearing was held pursuant to defendant's motion to suppress physical evidence (i.e., the gun which was

seized from him at the time of his arrest) as well as certain statements made by him at the time of his arrest. The evidence at the hearing was as follows: Officer Colleran testified that while on duty in a patrol car he received a radio report that there was a black man with a gun entering a red-front building at 115th Street and Fifth Avenue. The man was described as walking with a limp and wearing a red jacket and sneakers.

Officer Colleran and his two partners arrived at the scene at approximately midnight. The other two officers went into a red-front building while Colleran remained outside. Colleran, however, did look inside a bar located in that building but did not see anyone matching the description. In any event, while Colleran was waiting for his partners, he saw defendant come out of a bar located on the other side of the street. Defendant matched the description in that he was black, wore a waist-length red jacket and sneakers and walked with a limp. The only other person on the street was wearing different clothing than as described in the radio call and did not limp.

Colleran, with gun drawn, approached the defendant, identified himself as a police officer and told the defendant to stop. Defendant complied with that command. Colleran, without any inquiry, patted defendant down and found a .22 caliber revolver in the defendant's back rear pocket. There was no testimony that the officer saw any bulge prior to the frisk. Upon being found with the gun, defendant stated "Yeah, that's a gun." Defendant was thereupon taken to the precinct and after he was given *Miranda* warnings the defendant stated that a certain person had cut him with a straight razor and defendant returned to the area to find that person.

The trial court credited Officer Colleran's testimony concerning the information conveyed to him over the radio call. In this respect, there was some confusion as to whether the radio call relied upon by Colleran made any reference to the suspect's race. The print-out introduced into evidence did not mention the race of the suspect, although otherwise supportive of the officer's testimony.

The trial court, relying on *People v Taggart* (20 NY2d 335), found that the combination of the accurate and comprehensive description, the reliance upon a radio call, as well as the exigency of the situation, justified the stop and frisk. The exigency referred to by the court was limited to the fact that the radio call involved possession of a weapon capable of doing

serious physical injury and the police response was at midnight.

Concerning the statements made by defendant, it was held that the first statement was voluntary (spontaneous) and not made at a time when defendant was being questioned, while the second statement was made after *Miranda* warnings were given.

Recent cases have indicated that a police officer may not conduct a frisk at gunpoint in reliance upon information received through police radio calls where the information emanated from an anonymous source, and the police officer failed to first conduct any independent investigation, failed to make inquiry of the suspect and otherwise there was no independent verification of the information contained in the radio dispatch. The mere fact that the radio call involves a gun does not apparently change the situation for, in these recent cases, guns were also involved. (See *People v La Pene,* 40 NY2d 210; *People v Stewart,* 41 NY2d 65. See, also, *People v Townes,* 41 NY2d 97.)

Although the description herein was quite detailed, that did not under the principles set down in *La Pene (supra)* and reaffirmed in *Stewart (supra)* justify an immediate seizure at gunpoint and a frisk, all without inquiry by the officer and without furtive or suspicious activity of the defendant. Pursuant to the above cases, the officer may have been justified in approaching defendant and in asking questions. But he did not do that. He approached with gun drawn and ordered defendant to stop, which constituted a seizure within the meaning of the Constitution *(People v Cantor,* 36 NY2d 106).

The case at bar should be contrasted with *People v Green* (35 NY2d 193). In that case, a teenager approached an officer and stated that he had seen an attempted robbery at a nearby building. The teenager described the robber in detail and stated that he had a gun. At that point, defendant and two others passed by and the teenager identified defendant as the robber and, in response to the officer's question, the identification was confirmed. The officer followed defendant, grabbed him and found a gun. The on-spot identification there was more reliable than in this case. Yet, the Court of Appeals indicated that the *Green* case approached the limit for a finding of reasonable suspicion required to conduct a frisk (35 NY2d, at p 196). Also, the court noted the difference between a report that a person has a gun as compared to a report that

he has used it in the commission of a crime (see, also, *Adams v Williams,* 407 US 143, 146, where the Supreme Court noted the difference between an officer acting on information provided by a known informant as compared to a case "of an anonymous telephone tip").

I conclude on this record and under constraint of the recent Court of Appeals cases enumerated above that suppression of the gun should have been granted. The parties do not discuss whether the statements must also be suppressed. However, under the circumstances herein, it seems that those statements were tainted by the illegal search and must be suppressed *(People v Stewart, supra).*

The statistics advanced by responsible agencies concerned directly or indirectly with law enforcement attest to the ever-increasing rate of crime besetting our urban centers and more recently areas adjacent to those centers. Pleas and exhortations have been voiced alerting the citizenry and calling upon it to respond to the call of civic duty and responsibility by co-operating with the law enforcement authorities. Indeed, the enforcement and administration of justice has become a most popular "news" item in the mass media. All this is limned against a concern often expressed for the protection of the rights of the citizens. I have no quarrel with this laudatory concern, but I am dismayed when the concept of duty is overlooked or made little of in the equation of our experience of life. It is beyond cavil that vain lip service to duties in a vacuous reality wherein rights exist, independent of any balancing moral or social factors makes a semantical mockery of the very foundation of our laws and legal system. Of course, the rights of the citizen must be protected from improper overbearing conduct on the part of the State where such conduct is exhibited. However, we must be alert that our zealousness in this regard does not result in the application of legal reasoning and principles totally in the "abstract" with no true relation to the "real" gravamen of protecting society from the criminal. This process necessarily entails upholding order and justice in the balancing of conflicting rights and the equating of rights with corresponding duties.

The judgment of the Supreme Court, New York County (ROTHWAX, J.), rendered December 16, 1975, convicting defendant, upon his plea of guilty of attempted possession of a weapon and sentencing him, as a second felony offender, to a term of one and one-half years' to three years' imprisonment,

should be reversed, on the law, the motion to suppress should be granted and the indictment dismissed.

NUNEZ, J. (dissenting). "The proper analysis in cases of this nature is to examine the predicate for the police action and then determine whether or not that predicate justified the extent of the official intrusion on the individual." *(People v Stewart* and *People v Williams,* 41 NY2d 65, 66; see, also, *People v De Bour* and *People v La Pene,* 40 NY2d 210.) Emergency telephone calls do not lend themselves to evaluation of the informer's veracity. Yet the police would be remiss in their duties if they failed to investigate a call concerning a gun *(People v Williams,* 52 AD2d 520, affd 41 NY2d 65). A police officer may act on the strength of a communication from a fellow officer and assume its reliability *(Whiteley v Warden,* 401 US 560, 568; *People v Horowitz,* 21 NY2d 55, 60). In this case, responding to the broadcast, the police encounter the defendant who matches the description given: a black man wearing a red jacket and sneakers, and walking with a limp. When the officers arrive, defendant is across the street from the address provided by the caller. As the defendant matches the description provided, the officer may believe the defendant possesses a gun as reported, and that he is in danger. The officer can then make a limited search *(People v Taggart,* 20 NY2d 335, 337, cf. *People v La Pene, supra;* but see *People v Stroller,* 53 AD2d 816) not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence *(Sibron v New York,* 392 US 40, 63; CPL 140.50, subd 3). Whether or not a search or seizure is to be considered reasonable requires a weighing of the government's interest against the encroachment upon an individual's right to privacy and personal security *(People v Cantor,* 36 NY2d 106, 111). *Terry v Ohio* (392 US 1, 27) allows "a reasonable search for weapons for the protection of the police officer, where he has reason to believe he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." The encounter occurred near midnight. Darkness prevented the officers from making the observation of a weapon outline which justified the "pat down" in *People v Williams (supra).* The police acted prudently to insure their own safety.

I would affirm the judgment of conviction.

BIRNS, J., concurs with LUPIANO, J.; MURPHY, J., concurs in the result only. KUPFERMAN, J. P., and NUNEZ, J., dissent in an opinion by NUNEZ, J.

Judgment, Supreme Court, New York County, rendered on December 16, 1975, reversed, on the law, the motion to suppress granted, and the indictment dismissed.