■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DENNIS MONSANTO, Appellant.—Judgment, Supreme Court, New York County, rendered August 3, 1977, after a hearing on a motion to suppress physical evidence, convicting the defendant after a plea of guilty to the crime of attempt to commit the crime of criminal possession of a dangerous weapon in the third degree, reversed, on the law, the judgment vacated, the motion to suppress granted, and the indictment dismissed. The defendant, Dennis

Monsanto, was observed by Officers Sener and Maffia walking in front of a building on Lexington Avenue. The officers also observed through the glass doors of that building that two people were standing in the vestibule area and appeared to be having an argument. Officer Maffia entered the vestibule area. The other officer approached the defendant Monsanto and asked him what he was doing. He did not give Monsanto an opportunity to answer but, rather, pressed a second question: whether Monsanto knew the two people in the hallway. Monsanto denied knowing them. The officer then directed Monsanto into the hallway. Meanwhile, in the hallway, Officer Maffia was frisking one Raymond Perez, who was facing the wall with his hands stretched upward against the wall. The second person observed in the hallway was in a corner of the vestibule watching the proceedings. When Officer Sener came into the hallway, no weapons had yet been found in the possession of either Perez or Monsanto. Ultimately, Monsanto was found to be in possession of a weapon and an ammunition clip. The hearing court denied Monsanto's motion to suppress the physical evidence, and Monsanto pleaded guilty to the crime of attempt to commit the crime of criminal possession of a weapon in the third degree. We would reverse the determination of the hearing court and grant the motion to suppress. The observations of Monsanto by the police were insufficient for them to conclude that he was a participant in any illegal activity. His conduct of walking in front of the building on Lexington Avenue was equally consistent with innocent activity. There was nothing other than mere suspicion to connect Monsanto with the activities going on in the vestibule area. Officer Sener nonetheless directed Monsanto into the vestibule area and conceded that at that time Monsanto was not free to leave. Monsanto was not observed engaging in any overt criminal activity and was placed in custody merely for being in the vicinity of what the officers thought was the scene of a crime in progress.* This mere presence in the area was insufficient to constitute probable cause to detain Monsanto (cf. *People v Martin,* 32 NY2d 123; *People v Griffith,* 63 AD2d 138, 142). The continued detention of Monsanto, after the requested information produced an innocent response without the police having a founded suspicion that Monsanto was involved in criminal activity, was an improper seizure of his person *(People v Cantor,* 36 NY2d 106, 111-112), and the motion to suppress the evidence subsequently found in the defendant's possession should have been granted (cf. *People v De Bour,* 40 NY2d 210; *People v Cantor,* 36 NY2d 106). Concur—Sullivan, Bloom and Lane, JJ.; Sandler, J. P. and Silverman J. dissent in separate memoranda, as follows.

Sandler, J. (dissenting). The facts, comprehensively set forth in Justice Silverman's dissenting opinion, graphically illustrate the complex legal and constitutional questions that often confront police officers undertaking the conscientious discharge of their duties. The legal issues presented are no doubt close. Nonetheless, I think it clear that the police officers here acted throughout in a sensible and prudent manner. It is not necessary to determine whether or not the facts and circumstances gave rise to a reasonable suspicion of criminal activity under CPL 140.50 (subd 1) justifying the frisk of Perez. Even if that frisk was legally unjustified, which presents a close question, it is clear that the police had a right to consider his gun in their subsequent actions. *(Wong Sun v United States,* 371 US 471, 492.) The finding of the Perez gun, coupled with all the other circumstances,

---

* In fact, there was no robbery taking place in the vestibule, though the officers had thought so.

clearly supported, if it did not require, further police inquiry and the subsequent frisk of Monsanto. The closest question is presented by the lawfulness of the direction to Monsanto to enter the vestibule and the later direction to him, shortly after the police concluded that there was a conflict in the statements given, to place his hands against the wall. As to the direction to Monsanto to enter the vestibule, it is surely clear that the police observations at the very least justified an inquiry on their part to determine the meaning of the observed behavior. The test to be applied was set forth in *People v De Bour* (40 NY2d 210, 217) as follows: "The crucial factor is whether or not the police behavior can be characterized as reasonable which, in terms of accepted standards, requires a balancing of the interests involved in the police inquiry". The direction to Monsanto to enter the vestibule cannot be fairly evaluated as unreasonable under all the circumstances. Indeed, it would have been irresponsible for the police officer to have permitted his brother officer ro remain alone for an extended period of time inside the vestibule with the two unknown men. Nor would it have been sensible for him to enter the vestibule, leaving Monsanto outside, without knowing what had been learned by his brother officer. Significant here is the further comment in *People v De Bour (supra,* p 219), in which the Court of Appeals noted "it might be reasonable for the police at the scene of a crime to segregate and interview witnesses". The restraint of Monsanto implicit in the direction to enter the vestibule is surely no greater than that suggested in the segregation and separate interrogation of witnesses at the scene of a crime. The later direction to Monsanto to place his hands against the wall presents a somewhat different question, its lawfulness turning on whether or not reasonable suspicion then existed. However, that event seems to me legally immaterial here since it occurred immediately before the finding of the Perez gun gave rise to a right to frisk Monsanto and is causally unrelated to the finding of the gun he possessed. For the foregoing reasons, the motion to suppress was properly denied and the judgment should be affirmed.

Silverman, J. (dissenting). Defendant appeals from a judgment of the Supreme Court convicting him on his plea of guilty of criminal possession of a dangerous weapon in the third degree (Penal Law, § 265.02) and sentencing him to five years' probation. A motion to suppress the weapon was denied by the Supreme Court. The only issue in the case is the validity of the police "frisk" of defendant which discovered the weapon. On February 7, 1977 at about 9:30 P.M. two police officers of an anticrime unit, on routine patrol in an unmarked car, at 86th Street and Lexington Avenue in Manhattan, observed the defendant Monsanto walking back and forth between the doorway of 1275 Lexington Avenue and the curb, and intermittently looking into the doorway. As they passed the doorway, the officers looked through the glass door and saw two men, Cruz and Perez, in the vestibule talking and waving their arms. The officers parked their car and continued to observe all three men. The two men in the hallway appeared to be having an argument, and one of the men, Cruz, had an amount of currency in his hands. Defendant continued going back and forth between the apartment house door and the curb, and looking into the hallway. The actions of these three men appeared to the officers to match a pattern of so-called hallway robberies, with the man on the street as a lookout. The officers decided to investigate; one officer, Sener, would go up to Monsanto in the street and the other officer, Maffia, would go into the vestibule. Preparatory to this, Officer Maffia moved his gun from his ankle holster to his jacket pocket, but did not display it. Each officer displayed a shield. In the

hallway, Officer Maffia, after identifying himself, asked what was happening. The men answered they were friends. By this time Perez apparently had the money in his hand. Officer Maffia asked, "what about the money?" He received no clear answer from Perez. He became very suspicious and patted the men down. As he did so, he asked Perez, "what do you have" and Perez said, "yes, I have a piece." Officer Maffia asked him where and Perez said, "on the belt." The officer then found on Perez, tucked in the front of his pants, a .45 caliber automatic pistol, unloaded, and in his jacket pocket an ammunition clip containing ammunition for a .45 caliber automatic. In the meantime, Sergeant Sener had approached Monsanto and asked him what he was doing and whether he was with the other two in the hallway. Monsanto answered he was not with them. (Later on cross-examination, the officer phrased the question as whether Monsanto knew the people in the hallway.) The officer then said, "let's go into the hallway," and he saw that his colleague had the other men against the wall. They went into the hallway. Officer Maffia however had asked Perez and Cruz whether the fellow outside was with them, and they had said he was. On being informed by Sergeant Sener that Monsanto had denied that he knew them or was with them, and a gun having been found on Perez, Officer Maffia frisked Monsanto and found that Monsanto had in the front of his pants an unloaded .45 caliber automatic pistol, and on his person, not in the pistol, a clip of ammunition for a .45 caliber automatic pistol. The basic principles which the Supreme Court has laid down governing frisks seem to me to justify the police action and the validity of the frisk in this case. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' *Terry v. Ohio, 392 U. S. 1, 19".* (*Pennsylvania v Mimms,* 434 US 106, 108-109.) The leading case on the validity of police officers' searches for weapons is *Terry v Ohio* (392 US 1) where the court said (pp 30-31): "We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken." This language exactly fits the present situation. The police officers observed the unusual conduct which led them reasonably to conclude in the light of their experience that criminal activity might be afoot and the persons with whom they were dealing might be armed and presently dangerous; the police officers identified themselves and made reasonable inquiries; and nothing in the initial stages of the encounter served to dispel their reasonable fear for their own or others' safety. They were thus entitled, for their own protection, to conduct a carefully limited search of the outer clothing of the persons involved in an attempt to discover weapons which might be used to assault them.

The situation up to the discovery of Perez' gun.

In my view the question of whether the police officer's frisk of Perez was

valid does not affect the validity of the frisk of defendant, for the defendant has no standing to object to the frisk of someone else. Thus in *Wong Sun v United States* (371 US 471, 492) the Supreme Court held that evidence illegally seized as a result of an unlawful search of one defendant, and suppressible as to that defendant, could still be used against the codefendant. (Cf. *Goldstein v United States*, 316 US 114, 121.) I think the frisk of Perez was valid; and, in any event, it is illuminating to discuss the whole incident. In the present case the police officers were "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *(Terry v Ohio, 392 US 1, 21, supra.)* The police officers thought that "either it was a hallway robbery or it was a buy going down." They described the signs or marks of a pattern hallway robbery: "It would be someone outside, in one particular case because there are numerous cases of hallway robberies. In one of the cases it could be that one perpetrator would be on the outside of the building, used as a lookout, the other perpetrator, his companion, is inside the building with the person who is going to be robbed." They said these robberies usually take place either in the vestibule between two sets of doors or in the hallway behind the locked door. Nor was their suspicion mere afterthought. As they pulled past the building, one of the officers said to the other "hold it Bob, I think we have a robbery going down." The officer made this judgment "in light of his experience." *(Terry v Ohio, supra, p 27.)* The officers testified as to their experience with hallway robberies and their patterns. The New York Stop and Frisk Law, CPL 140.50, states the same principles as *Terry v Ohio.* It authorizes a stop of a person by an officer "when he reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor". (CPL 140.50, subd 1.) Here the officers did so reasonably suspect that a felony was being committed or about to be committed. At the very least they had seen the men "go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation." *(Terry v Ohio, supra, p 22.)* At this point it was only suspicion, however reasonable. Perhaps instead of a robbery it was only an illegal buy. Perhaps it was a perfectly innocent transaction. But there was enough there to give rise to a reasonable suspicion of crime and that is all that is needed to justify this limited stop. "A police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior *even though there is no probable cause* to make an arrest." (Italics supplied; *Terry v Ohio, supra,* p 22.) Considering the many thousands of hallway robberies that take place in this city every year, the police officers would have been derelict in their duty if they had not at least stopped to investigate. Thus the Supreme Court observed in *Terry v Ohio (supra,* p 23), in circumstances no more suspicious than those here involved: "It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." But such investigation requires that the officer, for his own protection, be .permitted to make sure that the person he is investigating is not armed. "There must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, *regardless of whether he has probable cause to arrest* the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the

belief that his safety or that of others was in danger." (Italics supplied; *Terry v Ohio, supra,* p 27.) And, again, New York's stop and frisk statute authorizes the search for a weapon where the officer "reasonably suspects that he is in danger of physical injury". (CPL 140.50, subd 3.) Here the officers suspected the crime of robbery, in which there is always a danger that the criminal is armed. "The actions of [defendant, and Perez and Cruz] were consistent with [the officers'] hypothesis that these men were contemplating a * * * robbery—which, it is reasonable to assume, would be likely to involve the use of weapons". *(Terry v Ohio, supra,* p 28.) That the officers were really concerned about the possibility that the persons they observed were armed is demonstrated by the fact that one of the officers went to the trouble of moving his pistol from his ankle holster to the pocket of his jacket where it would be more readily available, before approaching the men, although the officer did not display the weapon. It is true that the men did not complain of a robbery and indicated rather vaguely that they were engaged in some other kind of transaction. But the officers had a right not to be satisfied with that first response and to carry out their investigation in safety until they were satisfied. The police have a right to protect themselves while performing their "legitimate investigative function". *(Terry v Ohio, supra,* p 22.) A police officer can make a limited search "not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence". *(People v McLaurin,* 56 AD2d 80, 84, revd on dissenting opn of Nunez, J., 43 NY2d 902.) The stop and frisk statute (CPL 140.50, subd 3), provides that the officer may take and keep a weapon he discovers "until the completion of the questioning". The officers here were still engaged in their investigation when they took the weapons. Officer Maffia said that as he was frisking Perez, "at that particular time I didn't know if Cruz, at that particular instance was a complainant or if he wasn't. It was feasible that he could have been a defendant also, I don't know." At the time the gun was discovered on Perez, the officers still did not know that the incident was not a robbery. As Officer Maffia suspected a robbery, in which case he would be in physical danger (though it might turn out to be an incident which did not involve danger to him), he had the right to frisk Perez. In doing so, he found a .45 caliber gun and ammunition for it.

After the discovery of Perez' gun.

The frisk of Perez was in my view valid. But as I have said, so far as defendant Monsanto is concerned, it is legally irrelevant whether or not the police were justified in frisking Perez. *(Wong Sun v United States,* 71 US at p 492; *Goldstein v United States,* 316 US at p 121.) Before Monsanto was frisked, the officers knew that Perez had a gun on his person—knew it as a result of frisking Perez—either as I think a legally valid frisk, or even an invalid one to which Monsanto however has no standing to object. Meanwhile, Monsanto who acted as if he was somehow associated with the incident in the hallway—either as a lookout in a hallway robbery, or for some other reason going back and forth watching what was going on—had denied to Sergeant Sener that he was with the men in the hallway. But Perez and Cruz told Officer Maffia that Monsanto was with them. Officer Maffia said, "With that, I made Monsanto, in the vestibule, put his hands against the wall because Perez and Cruz had stated that they knew him, so therefore that put them together and naturally I searched him and I came up with a .45 automatic Remington in his waistband in the front of his pants." Sergeant Sener said, "Why we didn't speak to Cruz after we found the gun on Perez. After we found the gun on Mr. Perez, it changed the situation. In effect, I knew Mr. Monsanto was part of what was going on in

the hallway from his actions outside. At the point the gun was found, all questioning was stopped and we wanted to make sure no one was standing behind us. * * * As soon as we found one gun, it makes sense that if you find a gun on one person, you say wait a minute. Immediately Mr. Monsanto was frisked and we came up with a gun and Mr. Cruz was also frisked and we found nothing on Mr. Cruz and then we started to go into the questioning of what was going on." The officers' actions did indeed make sense. The test is "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *(Terry v Ohio, supra,* pp 21-22.) "The record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." *(Terry v Ohio, supra,* p 28.) "In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat-down.'" *(Pennsylvania v Mimms,* 434 US 106, 112, supra.)* (While it is not legally relevant, I am struck by the circumstance that Perez and defendant Monsanto each had on his person in the front of his pants a .45 caliber automatic pistol, unloaded, and that each also had on his person an ammunition clip with live ammunition that would fit that pistol; the pistols were of different brands. The stop and frisk were justified as a preliminary matter no matter what the investigation might ultimately show as to the nature of the incident. But the circumstances seem to me at least consistent with a negotiation for the sale by the partnership of Monsanto and Perez to Cruz of a .45 caliber pistol with or without an ammunition clip.) Accordingly, the motion to suppress was properly denied and the judgment should be affirmed.