THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
LESTER BRUCE, Also Known as JOHN BENN, Appellant.

First Department, December 23, 1980

#### APPEARANCES OF COUNSEL

*Ursula Bentele* for appellant.

*Margaret G. Sokolov* of counsel *(Mark Dwyer* with her
on the brief; *Robert M. Morgenthau, District Attorney,*
attorney), for respondent.

#### OPINION OF THE COURT

SULLIVAN, J.

At about 3:30 P.M. on the afternoon of August 2, 1977,
four uniformed police officers assigned to the 28th Precinct
Special Narcotics Enforcement Unit were notified that the
precinct telephone switchboard operator had just received
a report of two men with guns and narcotics in front of 112-
115 West 113th Street. The caller, who was not identified,
had described one man as wearing a striped dashiki, the
other an orange-colored shirt.

Within three minutes the officers drove to 113th Street
and St. Nicholas Avenue where a tall, neatly dressed, mid-
dle-aged male with short grayish hair approached the pa-
trol car and advised the officers that it was he who had just

called the 28th Precinct. Pointing west and urging the officers to hurry, the informant told the officers that the two men were headed in the direction of Seventh Avenue. Again, he described one man as wearing an orange shirt, the other a dashiki-type striped shirt worn outside the trousers. One of the officers, Jirak, believed that the informant described the stripes as red and white. When specifically asked, the informant said that both men, whom he described as a stick-up team, had guns. None of the officers knew the informant, whose name and address were not sought.

The officers drove west on 113th Street to Seventh Avenue and then north on Seventh Avenue to 114th Street. Failing to see anyone who fit the description of the two men, they made a U-turn at 114th Street and drove south on Seventh Avenue. Just south of the southwest corner of 112th Street and Seventh Avenue the officers observed two men, one wearing an orange-colored shirt, the other a loose-fitting red and white striped shirt which hung below his waist, walking together toward the corner of 112th Street and Seventh Avenue.

When it became apparent that the two men were about to cross Seventh Avenue, the officers decided to drive south another block, make a U-turn and come back up Seventh Avenue, since a large group of people were congregated on the southwest corner of Seventh Avenue and 112th Street. As the patrol car made a U-turn at 111th Street, the two men, whom the officers had kept in view, crossed Seventh Avenue to a point just south of the southeast corner of 112th Street and Seventh Avenue.

As the patrol car approached, the two men looked in its direction, and, according to Officer Jirak, "their movements became hesitating." The two men separated. The man wearing the loose-fitting red and white striped shirt walked towards the building line and then south, while the other stood near the corner.

Commanding, "Don't move! Police", all four officers exited the patrol car with their guns drawn. Two of the officers covered the man in the orange shirt and the other two approached the man in the striped shirt, later identified as Lester Bruce, the defendant. The officer nearest defendant

ordered him to put his hands in the air and to turn around slowly. As defendant began to comply, the officer put his hand on defendant's back and felt the handle of a gun near his waistline. The officer removed the gun, a .22 calibre revolver with five live rounds and one spent shell. As the gun was being removed, defendant remarked "Don't get nervous, it's only a gun." Defendant was then arrested.

Meanwhile, the other two officers had placed the man in the orange shirt against a car. As they were doing so they heard one of the officers in the vicinity of defendant yell over, "Watch out, my guy has a gun." Officer Jirak then proceeded to frisk the suspect and felt a hard object inside a folded newspaper in his right rear pants pocket. Officer Jirak removed the newspaper and found a .25 calibre automatic revolver with three live rounds in the clip.

Alleging a violation of his Fourth Amendment rights, defendant contends that the police officers, acting on the basis of information of vague and unknown reliability, the sole source of which was an anonymous tip, seized and searched him at gunpoint, without any prior inquiry and in the absence of exigent circumstances.

The suppression court found that, based on the report which they had received from the switchboard operator and the information provided by the informant, the officers had reasonable suspicion to stop defendant and his companion and that the limited intrusion which produced the revolver was justified. We agree.

Reasonableness is the touchstone by which police conduct is measured under the Fourth Amendment. *(Cady v Dombrowski,* 413 US 433, 439; *People v Prochilo,* 41 NY2d 759, 761.)* "[W]hether * * * a particular search or seizure is to be considered reasonable requires a weighing of the government's interest against the encroachment involved with respect to an individual's right to privacy and personal security * * * Thus, we must consider first whether * * * the police action was justified in its inception and secondly whether * * * that action was reasonably related in scope to the circumstances which rendered its initiation permissible." *(People v De Bour,* 40 NY2d 210, 215.)* What is required is a balancing of two societal interests, law enforce-

ment on the one hand and individual privacy and personal inviolability on the other. (See *Brinegar v United States*, 338 US 160, 176.)

Police officers acting on less than probable cause have the right to confront citizens for investigative purposes as long as the encounter is preceded by activity which gives rise to an "articulable suspicion" that criminal activity has occurred. *(Terry v Ohio*, 392 US 1, 31 [HARLAN, J. concurring].) While a telephone call from an anonymous source furnishing a general description and location of a "man with a gun" will justify a belief that criminal activity is afoot *(People v Cantor*, 36 NY2d 106; *People v De Bour*, *supra)*, it does not, by itself, constitute reasonable suspicion to stop and frisk anyone who happens to fit that description *(People v La Pene*, 40 NY2d 210; CPL 140.50). Such a predicate triggers only the police officer's common-law right to detain to the extent necessary to obtain explanatory information. *(People v De Bour*, *supra*, at p 223; *People v Cantor*, *supra*, at p 114.) But a radioed tip may support a reasonable suspicion justifying more intrusive police action, when considered in conjunction with other supportive factors, including those rapidly developing or observed at the scene. *(People v Benjamin*, 51 NY2d 267.) Before an officer "places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *(Sibron v New York*, 392 US 40, 64; *People v Stewart*, 41 NY2d 65, 69; see, also, *People v Sterling*, 63 AD2d 210.)

In assessing the reasonableness of police conduct in citizen street encounters, the Court of Appeals has stated that: "[T]he proper analysis in cases of this nature is to examine the predicate for the police action and then determine whether * * * that predicate justified the extent of the official intrusion on the individual. Thus, the predicate established defines the scope of permissible police conduct." *(People v Stewart*, 41 NY2d, at p 66.)

Based on their assessment of the citizen informant's credibility, their confirmation of the description of the two men

and the location where they could be found, and the reaction of defendant and his companion to their approach, the officers had sufficient knowledge to support a reasonable suspicion justifying a stop and frisk. *(People v Benjamin, supra; People v McLaurin,* 43 NY2d 902, revg 56 AD2d 80, on dissenting opn; *People v Sustr,* 73 AD2d 582.)

Contrary to defendant's assertions, the police officers here had more than an anonymous telephone tip as a basis upon which to act. Within minutes of receipt of the complaint they had an opportunity both to meet the citizen informant, a source whose trustworthiness has been recognized (see *People v Hicks,* 38 NY2d 90, 94), and also to assess his credibility on the basis of appearance and demeanor, factors crucial to any such assessment.

The facts here offer more support for the reasonableness of the stop than those in *McLaurin (supra),* and *Sustr (supra).* In each case, officers, acting on the basis of an anonymous telephone report describing an individual alleged to be carrying a gun, had stopped and, without prior questions, frisked an individual fitting that description. Unlike *McLaurin* and *Sustr,* the officers here personally spoke with the citizen informant, who confirmed his original report and elaborated upon it. Moreover, by complaining in person, the informant exposed himself to the risk of prosecution for providing false information to the police. (See Penal Law, § 240.50.)

Although the individual suspects in *McLaurin (supra)* and *Sustr (supra)* were described in greater detail than here, the description of two men, one wearing an orange-colored shirt and the other a red and white striped shirt, in combination, was just as specific, if not more so. Moreover, the relative distinctiveness of the shirt colors minimized the likelihood of misidentification. In *Sustr,* a description of a "light-haired white man wearing a silver jacket * * * standing on a specified corner" was deemed sufficient. (73 AD2d, at p 582.) In *McLaurin,* a pat down was justified by a description of a black man with a limp, wearing a waist-length red jacket and sneakers, even though the defendant actually came out of a building across the street from the address provided by the caller. (56 AD2d, at p 84.)

That the movements of the two men "became hesitating" justified a particularly cautious approach, since the officers were confronting two men reported to be armed. When the two separated the risk of danger increased, thus prompting the officers to draw their guns and disarm defendant and his companion before making any inquiries. Indeed, one of the officers testified, "I was afraid I was going to be killed" when asked why he drew his gun as soon as he exited the car.

In *People v Benjamin* (51 NY2d 267, *supra*) the officers had responded to a radio run that men with guns were at a specified location. At least 30 people were gathered and as the officers approached to within 10 feet, defendant, who was standing on the sidewalk, stepped backwards toward the curb while simultaneously reaching beneath his jacket with both hands to the rear of his waistband. The Court of Appeals (p 269) upheld an immediate pat down precipitated by the officer's fear that " 'possibly [the defendant] had a gun secreted.' "

Reasonably suspicious that they were in danger of physical harm, the officers had the right to make a limited self-protective search for weapons *(People v Arthurs*, 24 NY2d 688; *People v Taggart*, 20 NY2d 335, 337; cf. *People v La Pene*, 40 NY2d 210, *supra)*, not to discover evidence of crime, but to allow them to pursue their investigation without fear of violence. *(Sibron v New York*, 392 US 40, 63, *supra;* CPL 140.50, subd 3.) For this reason defendant's reliance on *People v Elwell* (50 NY2d 231) is misplaced. There, the court established the standard in this State for testing the sufficiency of information supplied by an informant who has not revealed the basis of his knowledge. The Court of Appeals held that it is not enough that the police have been able to confirm a number of details of noncriminal activity supplied by the informant. Details sufficiently suggestive if or directly related to the criminal activity reported must also be confirmed. But there the court was addressing the issue in the context of probable cause*

---

* More specifically, the court dealt with the *Spinelli-Draper (Spinelli v United States*, 393 US 410; *Draper v United States*, 358 US 307) aspects of the "basis of knowledge" prong of the *Aguilar (Aguilar v Texas*, 378 US 108) test for probable cause. *(People v Elwell, supra*, at p 234.)

for a full-scale warrantless seach, rather than, as here, reasonable suspicion for a stop.

As already noted, the determination whether police conduct is reasonable ultimately involves a balancing of the citizen's right of privacy and society's interest in the apprehension of a suspected lawbreaker. *(People v Cantor*, 36 NY2d, at p 111; *People v Jackson*, 72 AD2d 149, 153.) The predicate for the police action defines the extent of the permissible intrusion. *(People v Stewart*, 41 NY2d, at p 66.) In the case of a report that particular individuals are carrying guns the danger to society may be great. Thus, prompt police action is compelled. Given this predicate, we should accord the police officers' assessment of the danger confronting them considerable weight in the determination of whether the intrusion was constitutionally justified.

The officers' course of conduct, culminating in a stop and frisk only after they had a reasonable suspicion that defendant and his associate were committing a crime, was justifiable at every stage. Suppression of the gun was properly denied.

Finally, we find the other issues raised on this joint appeal from two judgments of conviction to be without merit.

Accordingly, the judgments, Supreme Court, New York County (DICKENS, J., at suppression; POLSKY, J., at trial; HAFT, J., at sentence), rendered October 5, 1978, convicting defendant of criminal possession of a weapon in the third degree and robbery in the third degree, and sentencing him to concurrent indeterminate terms of three and one-half to seven years on each, should be affirmed.

BIRNS, J. P., SANDLER, MARKEWICH and SILVERMAN, JJ., concur.

Judgments, Supreme Court, New York County, both rendered on October 5, 1978, affirmed.