THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RALPH FRANCIS, Appellant.

First Department, May 14, 1985

**APPEARANCES OF COUNSEL**

*Meira Rosenberg* of counsel (*William E. Hellerstein,* attorney), for appellant.

*William G. Scher* of counsel (*Jeanne E. Zunich* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

FEIN, J.

Police responded to a tip concerning a "man with a gun". At issue is the level and intensity of the police response, an approach with guns drawn and a thorough body search which yielded a gun only upon a renewed effort.

Two police officers on motorized patrol on 8th Avenue near 136th Street at 2:30 in the morning were flagged down by a pedestrian described by them as a "clean cut" and "effeminate" black male who "appeared to be a homosexual". He reported that he had observed a man on the street, outside a known homosexual bar, who "had a gun in his hand". The weapon was described as a small snub-nosed revolver with black finish, being carried in "the front" of the man's body, "around his abdomen". The gun carrier was described as a stocky black male wearing a white T-shirt and dark blue jeans and his companion as a male wearing darker clothing, with lighter colored jeans. The informant said he had followed the pair on foot for 11 blocks, looking for police

along the way, until he was finally able to flag down these two officers at the corner of 8th Avenue and 136th Street. The informant then told the police that the pair had entered "a grocery store up the block on the other side of 8th Ave." The officers could see the lighted store, from where they were. They told the informant "to stay where he was". The officers then radioed for backup assistance and "proceeded to the grocery store". The officers looked into the store. They observed three people inside the store during the two minutes until the backup car arrived. No one left the store. As the backup car arrived, the two officers entered the grocery store with guns drawn.

One of the officers, who stated that defendant fit the description given by the informant, testified as follows: "I entered with my partner with my gun out in the store. I stepped in the store, about eight or ten feet there is a counter and then half inch plexiglass from the counter top to the ceiling. The store clerk deals through a revolving kind of shelf and that's the eay [sic] they serve the public. He is stuck up enough. And we entered the store. Mr. Francis was in front of me at the counter, another individual was to his left and the other person with Mr. Francis was to his right, but further toward the wall. By this time the backup had arrived. They entered the store behind me. The individual that was to Mr. Francis' left, I motioned to the rear and another officer took him out. I told Mr. Francis to hit the wall. And I was going to search him. His hands went up against the plexiglass, but not as high as I thought he could reach. I proceeded to pat down on the extremities of his body, starting at the waistband in the front around on both sides down the small of his back. I searched the inside of his groin area, his crotch, down inside of his legs, his socks, back up the outside, his armpits, around his kneck [sic] and down inside the collar of his shirt with negative results. However Mr. Francis was uneasy, his hands kept coming down off the wall. He kept turning. He did not maintain a stationary repose on the wall, as I had ordered him to do. I reminded him three or four times to keep his hands up on the plexiglass and I searched him again. This time I put my hand under his crotch and I grabbed him and I lifted up in his crotch area and I felt something hard, metal like hit my hand. At that time I yelled to my partner, 'Eddie, he got something.' I spun him around. I pushed him against the plexiglass and unbuckled his trousers. He had a loaded 38 caliber revolver in a leather puch [sic] that was tied around his waist there. It was tied inside of his pants, outside of his underwear. The gun was put in the pouch, the handle was turned to the right side of his body. And the gun was secreted in such a way as

to avoid detection through a preliminary search. You had to really grab him in order to find the gun and in addition to that the gun was behind his belt, which if you felt his belt you would not feel the gun."

Plainly this was something more than a mere pat down or frisk. It was practically a full-blown search and seizure. To justify a stop and frisk, the information furnished by the informant must be sufficiently reliable so as to form the basis for an articulable reason to suspect that the person seized and searched is in possession of a gun.

As noted in *People v Russ* (61 NY2d 693, 695): "A frisk requires reliable knowledge of facts providing reasonable basis for suspecting that the individual to be subjected to that intrusion is armed and may be dangerous (*People v Carney,* 58 NY2d 51; *People v Benjamin,* 51 NY2d 267)."

Here, the sole predicate was the information furnished by the unknown informant who left the scene and whose name and address were not determined. As in *Russ* (*supra*), no inquiry was made of defendant so he neither refused to answer nor answered evasively (*see, People v Klass,* 55 NY2d 821). No suspicious bulge was perceived in defendant's clothing as in *People v De Bour* (40 NY2d 210, 213). Defendant's appearance and movements were not concealed by darkness as in *People v McLaurin* (43 NY2d 902, *revg on dissent* 56 AD2d 80, 84). In effect, the information relied upon was received from an anonymous source, an unidentified individual, a weak source. (*People v De Bour,* 40 NY2d, at p 224; *cf. People v Green,* 35 NY2d 193, 195; *People v Moore,* 32 NY2d 67, *cert denied* 414 US 1011.) Unlike *Benjamin* (*supra*), no furtive movements were made by defendant except such movements as he made during the search.

The predicate for police action must exist at the time the action is instituted, as stated in *De Bour* (40 NY2d, at p 215). The court must consider "first whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible".

In *Klass* (*supra*), an unidentified passerby informed the police, who were on the sidewalk in front of a building, that there was a man with a gun, which he had seen, in the first-floor hallway of the building. The man was described as white, 20 to 22 years of age, wearing a brown short-waisted jacket. Within 20 seconds the officers ran the 30 feet into the hallway where they saw the defendant, the only person in the hallway. He matched the description they had just been given. When they asked him to

identify himself, the defendant said nothing. When they asked him what he was doing in the premises, he again said nothing. He was then patted down, and a loaded .25 caliber pistol was discovered in his sock. In that case, the frisk was held to be lawful.

The analysis of the problem in *People v Carney* (58 NY2d 51, *supra*) is instructive. As that case holds, citing *Terry v Ohio* (392 US 1, 21), a stop and frisk is valid when " 'the police officer [is] able to point to specific and articulable facts which, if taken together with rational inferences from those facts, reasonably warrant that intrusion.' " The propriety of the frisk is the officer's personal knowledge of the circumstances at the outset.

Thus, in *Benjamin* (*supra*), the mere anonymous tip of "men with guns" did not justify a pat down. However, the frisk was justified by the observations of the officer when he arrived at the scene and saw the defendant in that case reach behind his jacket to his waistband, where a weapon might be concealed. As the *Carney* court noted in commenting on *Klass* (*supra*) where the identification was furnished by an unidentified person, as in our case, additional circumstances provided the justification for the frisk in *Klass*. "Only after Klass refused to give his name or an explanation for his presence did the officers frisk him, thereby discovering a gun. Implicit in this court's affirmance was the recognition that, although initially acting on secondhand information, the officers had articulable knowledge of circumstances tending to support a reasonable suspicion that Klass was dangerous." (*People v Carney*, 58 NY2d, at p 54.) In our case we have only the unidentified informant's account. Nothing else occurred prior to the search.

As ruled in *People v Rivera* (14 NY2d 441, 444, *cert denied* 379 US 978): "The first problem is the authority of the police in the circumstances shown here to stop and question defendant. The validity of subsequent police action would in turn necessarily rest on the initial right to make the immediate and summary street inquiry." As the *Rivera* court noted and as we all must acknowledge, the authority of the police to stop a person and inquire on the basis of information such as the police had here involves hazards. The answer "may be a bullet", or, as noted in *Benjamin* (*supra*, p 271), "a glint of steel". The concerns for the liberty and privacy of the individual must be balanced against the risks. The level of intrusion must be measured by the reasonableness of the justification for undertaking it. It appears that what occurred in this case was a "search" and not a mere "frisk". A frisk is a contact or patting of the outer clothing of a

person to detect by the sense of touch whether a concealed weapon is being carried, something less intrusive than what occurred here. However, this is not dispositive.

As stated in *Rivera* (*supra,* at p 447): "The fact that the police detective actually found a gun in defendant's possession is neither decisive nor material to the constitutional point in issue. The question is not what was ultimately found, but whether there was a right to find anything."

In determining the level of intrusion, the comments in *People v Green* (35 NY2d 193, 195-196) are instructive. There, the unidentified street informant pointed out a suspect and told the police not only that the defendant had a gun but that he had already committed a crime. The frisk which was found to be justified, revealed a gun. The court stated (35 NY2d, at p 196): "In our view this case approaches the limit for a finding of reasonable suspicion prerequisite to a frisk (cf. *People* v. *Bronk,* 31 NY2d 995). There is a difference of significant degree between a report only that a person has a gun in his possession and another report that a person not only has a gun but that he has just used it for the commission of a crime. Similarly, turning the defendant around by his arm for a pat down is not the same as a bear-hug grab from the rear by one not known to be an officer of the law. A citizen walking our streets should not, without more, be exposed to physical assault by a police officer on the basis of an unsubstantiated report of mere possession of firearms volunteered by a stranger. To condone such conduct would be to expose innocent persons to harassment by pranksters and irresponsible meddlers. As indicated, however, there was more in the case now before us."

Here, an unidentified informant reported that the defendant had a gun. No conduct of the defendant at the time of the institution of the frisk and search justified the level of intrusion. He made no attempt to flee. No police inquiry was made to corroborate the informant's credibility (*People v La Pene,* 40 NY2d 210, 226, *supra*). The only demonstration of the reliability of the informant was the discovery of the gun, which obviously is irrelevant to the issue. Unlike the situation in *People v Marin* (91 AD2d 616), the informant here was not identified, and he furnished no information that a crime had been committed other than the assertion that defendant had a gun. The activity of the defendants in *Marin* when approached by the officer, together with the information furnished by an informant known to them, justified the search in that case. There was no such activity nor other corroborating circumstances here. Nor are the circumstances here similar to those in *People v Chestnut* (51 NY2d 14),

where the seizure was justified by the officer's observation that one defendant had passed what appeared to be a gun to Chestnut.

In order to deny suppression in our case, we must rule that information from an unidentified informant that another person has a gun in his possession is sufficient to justify a gunpoint search, without inquiry as to other evidence corroborating the informant. No cases have been found which support such a proposition. To rule so would be to approve an unreasonable search and seizure.

The motion to suppress should have been granted.

The judgment of Supreme Court, New York County (Leonard N. Cohen, J., at suppression hearing; Carol Berkman, J., at plea; Frederic S. Berman, J., at sentence), rendered April 25, 1983, convicting defendant on plea of guilty to criminal possession of a weapon in the third degree and sentencing him as a predicate violent felony offender to 2¾ to 5½ years' imprisonment, should be reversed, on the law, the motion to suppress should be granted, and the indictment should be dismissed.

MILONAS, J. (dissenting). In my opinion, the judgment of the Supreme Court should be affirmed.

At approximately 2:30 A.M. on July 24, 1982, Police Officers Harold Peterson and Edmund Gridley were on patrol in a marked radio car proceeding north on 8th Avenue in the vicinity of 136th Street when they were flagged down by a "clean-cut" black man about six feet tall and weighing 160 pounds. Officer Peterson pulled the vehicle alongside the curb, and the man approached the officers. He stated that he had observed a black male in front of a bar at 125th Street and 8th Avenue who was armed with a small black, snubbed-nose revolver around his abdomen. According to the informant, the man was clad in dark blue jeans and a white "T" shirt and was in the company of another black male wearing darker clothes than himself. The informant claimed to have followed the two men from the bar to a grocery store located on the corner of 8th Avenue and 136th Street, which they had entered. The officers could see into the grocery store from where they were positioned, and they noticed the two men described by the informant. Although the officers did not ask the informant for his name, they instructed him to wait. The officers radioed for backup assistance and immediately thereafter went to the grocery store, entering with their guns drawn. Several backup officers were close behind them.

Inside the grocery store, in which a half-inch-wide piece of plexiglass had been installed from the counter top to the ceiling,

were three persons, excluding the cashier. Two of the men, defendant herein and his companion, matched the descriptions provided by the informant. Officer Peterson directed the defendant to "hit the wall" and then, as he testified at the suppression hearing: "proceeded to pat down on the extremities of his body, starting at the waistband in the front around on both sides down the small of his back. I searched the inside of his groin area, his crotch, down inside of his legs, his socks, back up the outside, his armpits, around his neck and down inside the collar of his shirt with negative results. However, Mr. Francis [the defendant] was uneasy, his hands kept coming down off the wall. He kept turning. He did not maintain a stationary repose on the wall, as I had ordered him to do. I reminded him three or four times to keep his hands up on the plexiglass and I searched him again. This time I put my hand under his crotch and I grabbed him and I lifted up in his crotch area and I felt something hard, metal like hit my hand. At that time I yelled to my partner, 'Eddie, he got something.' I spun him around. I pushed him against the plexiglass and unbuckled his trousers. He had a loaded .38 caliber revolver in a leather pouch that was tied around his waist there. It was tied inside of his pants, outside of his underwear. The gun was put in the pouch, the handle was turned to the right side of his body."

Following discovery of the gun, the defendant and his associate were placed under arrest and removed to the station house. The trial court subsequently denied the defendant's motion to suppress the weapon, finding the testimony of the police officers to be credible and their actions justifiable. In the view of the court, the informant, while unidentified, was reliable and had provided the police with a specific description of the defendant, including his clothing, the gun and the part of the body where it was secreted. These details, the court decided, lent credence to the informant's account and distinguished the case from one concerning an anonymous telephone tip.

The issue presented herein — whether the conduct of the police officers was reasonable — "must necessarily turn on the facts in each individual case". (*People v Green,* 35 NY2d 193, 195; *see also, People v Prochilo,* 41 NY2d 759.) In evaluating the propriety of police action, it is necessary to determine whether that action was justified at its inception and reasonably related in scope to the circumstances involved. (*People v De Bour,* 40 NY2d 210; *People v Cantor,* 36 NY2d 106.) In that connection, the events giving rise to the encounter between the officers and the defendant "must be viewed and considered as a whole,

remembering that reasonableness is the key principle" (*People v Chestnut,* 51 NY2d 14, 23, *cert denied* 449 US 1018).

An examination of the record herein reveals no basis for disturbing the trial court's conclusion that the extent of the intrusion which occurred was appropriate to the circumstances and that the police officers acted properly. The predicate for the police conduct was not an anonymous radio run but a "clean-cut", well-dressed informant who personally approached the officers to convey to them his own observations. The informant was responsive to all of the officers' inquiries and gave them an extremely detailed description of the defendant, his companion, the type of gun and the location of the gun on the defendant's body. Moreover, the informant stated that he had followed the two men to a grocery store, and the officers saw two men in the store who fitted the descriptions. Regarded in its totality, the situation before us is scarcely comparable to that of an anonymous tip of "men with guns" referred to by the Court of Appeals in *People v Benjamin* (51 NY2d 267) which does not, without more, provide the degree of reasonable suspicion warranting a stop and frisk. The mere fact that the officers neglected to obtain the informant's name and address does not negate the reliability of the informant and render his information suspect. (*See, People v Green, supra.*) Since the officers possessed the requisite reasonable suspicion to believe that the defendant was armed, they were confronted with a situation in which a rational person would believe that his safety or the safety of others was in danger. Consequently, Officer Peterson did not act improperly in stopping the defendant and frisking him. In the course of the pat down, the defendant twisted and turned, thus hindering the officer's attempt to locate the weapon and necessitating further exploration. Consequently, the trial court appropriately denied the motion to suppress the gun.

MURPHY, P. J., and CARRO, J., concur with FEIN, J.; SANDLER and MILONAS, JJ., dissent in an opinion by MILONAS, J.

Judgment, Supreme Court, New York County, rendered on April 25, 1983, reversed, on the law, the motion to suppress is granted, and the indictment is dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.