(December 26, 1985)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE CASTRO, Appellant.—Judgment, Supreme Court, New York County (Harold Baer, Jr., J., at suppression hearing; Robert M. Haft, J., at plea and sentence), rendered January 13, 1984, which convicted defendant, upon his plea of guilty, of the crime of attempted criminal possession of a weapon in the third degree (Penal Law §§ 110.00, 265.02 [4]), and sentenced him, as a predicate felon, to an indeterminate prison term of from 2 to 4 years, is affirmed.

In the early morning hours of March 7, 1982, New York Police Sergeant Escobar and Police Officers Mancuso and King (King) were on motor patrol in the vicinity of Washington Street in the West Village of Manhattan. These officers were in civilian clothes and were riding in an unmarked vehicle.

Sometime about 12:30 A.M., on Washington and Bethune Streets, the officers arrested three transvestites, who had been loitering there for the purposes of prostitution. Thereafter, these three prisoners were placed into the officers' car.

Upon the basis of past arrests, the officers knew two of the prisoners, but they had never before seen the third prisoner.

Soon after being taken into custody this previously unknown prisoner turned informant, and told the officers, in pertinent part: (1) that across the street there was a Hispanic man with a gun, who was standing with two black men; and, (2) that this Hispanic man "had told [the informant] that he

was going to rip off a 'queen' down here that night". In response to receiving this tip, the officers looked across the street and observed a Hispanic man standing with two black men in front of a cyclone fence. The area was brightly lit and there was barely any pedestrian or vehicular traffic.

At this point, the officers immediately crossed the street to investigate. As a result of the officers' action, the three prisoners, including the informant, were left unguarded in the police vehicle.

When the officers arrived on the other side of the street, they first identified themselves, as police officers, to the three men in question, and then ordered those men to put their hands up against the fence, mentioned *supra,* so that the officers could conduct a pat-down search. During the course of that search, Officer King found a loaded .22 caliber automatic weapon in the waistband of the defendant, who was the Hispanic man who had previously been identified by the informant as the man with the gun. After this weapon was found, the defendant was arrested.

Following defendant's arrest, the officers returned to their car, and found only two prisoners there since the informant had fled. Although the police made efforts to track down this informant, all of their efforts were unsuccessful.

Subsequent to defendant's indictment for the crime of criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]), he moved to suppress the weapon. This motion resulted in a suppression hearing. The single witness at that hearing was Officer King, who was a veteran of 15 years service in the Police Department, of which 14 of those years had been spent assigned to the sixth precinct, whose area of responsibility encompassed the location where defendant was arrested.

In pertinent part, King testified: that neither he nor his fellow officers had obtained the informant's name before he escaped; that the two remaining prisoners, when questioned about the identity of the informant, denied knowing anything about him; that, prior to leaving to investigate the subject tip, the officers "told [the three prisoners] to stay where they were [in the back of the police vehicle]"; that all of the officers went to investigate, since, as mentioned *supra,* there were two other men with the defendant; and, that the officers took the tip seriously, in view of "the way [the informant] said it * * * [T]he way he came out with it, it seemed like it was good information" (material in brackets added).

The suppression court denied the defendant's motion, since it found that the evidence adduced before it justified the pat-down search that produced the gun.

We agree.

Unlike any anonymous faceless telephone tipster, the instant informant communicated his tip in a face-to-face meeting with experienced officers like King, who had an opportunity to evaluate his reliability "on the basis of appearance and demeanor, factors crucial to any such assessment" *(People v Bruce,* 78 AD2d 169, 173). Another indication of this informant's reliability is found in the fact that "[w]here * * * [an informant] asserts to police that an individual is carrying a weapon at a specific time and place, that information may be viewed as circumstantially reliable since, if it proves false, the [informant] himself would be subject to a charge of falsely reporting an incident. *(See* Penal Law, § 240.50, subd 3, par [b] [other citations omitted]"; *People v Earley,* 76 AD2d 335, 340 [material in brackets added].)

Since the informant asserted that the defendant had a gun and intended to "rip off a 'queen' * * * that night," we find that the officers would have been derelict in their duty if they had not investigated and conducted the pat-down *(People v Williams,* 52 AD2d 520, *affd sub nom. People v Stewart,* 41 NY2d 65). We held in *People v Bruce (supra,* p 175): "[i]n the case of a report that [a] particular [individual is carrying a gun] the danger to society may be great. Thus, prompt police action is compelled. Given this predicate, we should accord the police officers' assessment of the danger confronting them considerable weight in the determination of whether the intrusion was constitutionally justified" (material in brackets added).

In substance, the dissenter contends that there was no basis to credit the informant's information. We disagree. The suppression court specifically found both the officer credible and the informant reliable. "Credibility is determined by the trier of facts who has the advantage of observing the witnesses and necessarily is in a superior position with respect to that aspect than an appellate court which reviews but the printed record [citations omitted]". *(People v Wright,* 71 AD2d 585, 586.) Moreover, recently the United States Supreme Court in *Illinois v Gates* (462 US 213, 232), stated: "Informants' tips * * * come in many shapes and sizes from many different types of persons". In determining what is reasonable police conduct, we must consider the police officer's actions "as a whole,

remembering that reasonableness is the key principle" *(People v Chestnut,* 51 NY2d 14, 23, *cert denied* 449 US 1018). Here the officer had a reasonable suspicion that the defendant, the only Hispanic man on the street, had a gun, and appropriately conducted a pat-down. The object of the information, the defendant, was clearly within the view of the officer and the informant, and it was obvious that the description was accurate.

We find the conduct of the police was reasonable, and accordingly, we affirm. Concur—Sandler, Ross, Asch and Ellerin, JJ.

Murphy, P. J., dissents in a memorandum as follows: The facts are lamentably spare. At 12:30 A.M., on March 7, 1982, plain-clothes Police Officers King, Mancuso and Escobar arrested three men on the corner of Bethune and Washington Streets for loitering for the purpose of engaging in prostitution. One of the arrested men, a transvestite of unknown identity, told Officer King that a Hispanic man clearly visible across the well-lit, little-trafficked street had a gun, and that this same man had threatened to "rip off a queen." The police officers immediately crossed the street, and without any preliminary inquiry, had defendant and his two companions place their hands upon a nearby fence. A pat-down search of all three men produced a .22 caliber automatic revolver from defendant's waistband. On returning to their car with defendant, the officers discovered that their anonymous informant had fled. He has been neither seen nor heard from since.

Defendant moved to suppress the gun. At the suppression hearing Officer King explained that he credited the anonymous informant's tip because "the way he said it, I don't know, the way he came out with it, it seemed like good information." The motion to suppress was denied and defendant was convicted of criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]).

The only question posed on this appeal is whether the search of defendant violated his 4th Amendment right to be free from unreasonable searches and seizures, thereby necessitating suppression of the illegally obtained evidence upon which defendant's conviction is predicated.

It is by now well established that a police officer may stop and frisk a suspect only where "the officer [is] able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *(Terry v Ohio,* 392 US 1, 21; *People v Carney,* 58

NY2d 51, 53-54.) The articulable facts required by *Terry* may be supplied by a reliable informant, or that may be the product of the officer's own observations, or a combination of the two when either alone would be insufficient. Yet whatever its source, the information must be specific because "specificity in the information upon which police action is predicated is the central teaching of * * * Fourth Amendment jurisprudence [citations omitted]." *(Terry v Ohio, supra,* p 21, n 18.)

In this case, the police acted exclusively upon information supplied by an anonymous informant, by definition a weak source. *(People v De Bour,* 40 NY2d 210, 224; *cf. People v Green,* 35 NY2d 193, 195; *People v Moore,* 32 NY2d 67, *cert denied* 414 US 1011; *People v Francis,* 108 AD2d 322, 324.) The informant was completely unknown to the police and to those arrested with him. Subsequent efforts to locate the informant proved futile. There was manifestly no basis to credit the informant's tip.

The People urge, relying on *People v Bruce* (78 AD2d 169), that Officer King was able to assess the informant's credibility based on his appearance and demeanor. Yet, the informant in *Bruce,* a tall, neatly dressed, middle-aged man with short grayish hair, at least presented conventional features which might, in some measure, support the belief, however superficially founded, that the informant was responsible and trustworthy. Here, by contrast, the informant was a transvestite whose somewhat exotic appearance and demeanor cannot seriously be advanced as indicia of reliability. Nor is the belief in the informant's credibility, or capacity for responsible conduct, enhanced by his immediately preceding arrest for loitering for the purposes of prostitution.

Police action must be justified at its inception. *(People v De Bour, supra,* p 215; *People v Francis,* 108 AD2d 322, 324, supra.) In the present case, justification depends on the existence of the specific and articulable facts required by *Terry (supra). (See also, People v Russ,* 61 NY2d 693, 695.) Such facts are manifestly absent. Officer King was notably inarticulate when he tried to explain his reliance on the anonymous informant, stating: "I don't know, the way he [the informant] came out with it, it seemed like good information." An anonymous tip does not become the basis for police action simply because it seems good. Minimally, there must be some articulable fact indicating why the tip seemed good, otherwise *Terry's* call for specific and articulable facts is all but meaningless.

It is undisputed that an anonymous tip of gun possession

alone does not justify a frisk. *(People v Benjamin,* 51 NY2d 267, 270; *People v Francis,* 108 AD2d 322, 325, *supra.)* The only additional information supplied by the informant, that defendant had threatened to "rip off a queen", does not appreciably increase the pool of articulable facts upon which the immediately ensuing police action rested. The informant did not specify, nor was he asked, who was to be "ripped off", when the crime was to occur, or at what time. The circumstances under which the alleged threat was made were not described, and the police made no attempt to inquire further. The police did not even ascertain whether the informant had seen the gun with which the impending crime was presumably to be committed. *(Compare, People v Klass,* 55 NY2d 821.) No other details tending to substantiate the tip were elicited from the informant, nor were there other corroborative circumstances.

After speaking with the informant, the police officers immediately approached defendant. Defendant did not move suspiciously *(see, People v Benjamin, supra; People v Bruce, supra,* p 173);* he did not refuse to respond to questions because he was asked nothing *(see, People v Russ, supra);* there was no suspicious bulge in defendant's clothing *(see, People v De Bour, supra,* p 213); neither defendant nor his movements were concealed by darkness since the street was well lit *(see, People v McLaurin,* 43 NY2d 902, *revg on dissent of Nunez, J.* 56 AD2d 80, 84-85). Nevertheless, defendant and his companions were summarily placed up against a fence and frisked.

We are left with a conviction resting upon a search performed in exclusive and inexplicable reliance on a conclusory, nonspecific tip by an anonymous arrestee who promptly escaped from police custody upon investigation of the tip and has not been heard from since. A search under these circumstances affords innocent citizens little or no protection against police intrusions instigated by irresponsible meddlers and those dangerously seeking to divert police resources to improper ends. The entirely unwarranted police action in this case not only violated the 4th Amendment rights of defendant and, incidentally, his two wholly innocent companions, but it allowed an arrestee to escape. Neither public safety nor constitutional guarantees against unreasonable searches can be secured when the police are effectively put at the disposal of anonymous tipsters.

The judgment appealed from should be reversed; defendant's motion to suppress should be granted, and the indictment against him dismissed.