THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v CARLOS CARTAGENA, Respondent.

First Department, March 16, 1993

APPEARANCES OF COUNSEL

*Donald J. Siewert* of counsel *(Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*Peter H. Dailey* for respondent.

### OPINION OF THE COURT

ELLERIN, J.

Defendant was arrested at the South Street Seaport in Manhattan during a fireworks celebration and charged with criminal possession of a weapon in the third degree. The issue before us is the propriety of the police conduct preceding defendant's arrest.

At the hearing on the defendant's motion to suppress the weapon and certain postarrest statements, Officer David Ruiz testified that on June 10, 1991 he was on crowd control duty at the South Street Seaport when, at approximately 8:00 P.M., he was approached by a young man, whom he described as black, in his twenties or thirties, 5 feet, 7 inches in height and wearing jeans and a summer shirt. Pointing toward defendant, who was wearing a black shirt and was walking slowly through the crowd with two women and a man about 40 to 50 feet away, the man stated, "That man with the black shirt has a gun and a black bag." Ruiz asked the man how he knew about the gun and he replied that he had seen the defendant "brandishing the gun to his friend in a black bag." At this

point, Officer Ruiz and the defendant were surrounded by a dense crowd. After Ruiz discussed the matter with his sergeant, who was nearby, Ruiz walked toward defendant from the front while his sergeant approached from the rear. Ruiz, who put his hand on his gun but did not draw it, said to defendant, "Yo, what's up, homeboy?" and immediately reached for the zippered black bag which defendant was holding under his arm. As soon as he touched the bag he felt the weight and the contour of a gun, and he then pulled the bag away.

The defendant's testimony differed somewhat. He testified that he was in the crowd at about 8:00 P.M. when he overheard a police radio call report that: "[T]hey are looking for a guy with a black shirt with some design in the front." Officer Ruiz then approached him from the front and said, "Do you have anything on you?" and defendant replied that he did not. While two officers stood at defendant's rear, Ruiz frisked him from his ankles up to his waist, and then grabbed his bag from under his arm, opened it and found the gun.

■ The court fully credited the testimony of Officer Ruiz and, to the extent that it did not contradict the testimony of the officer, also credited the defendant's testimony. Based on these facts, the court suppressed the weapon, finding that Officer Ruiz' actions constituted a forcible search and seizure not supported by probable cause. Because we find that, under these circumstances, Officer Ruiz acted properly, we reverse.

The issue which confronts us, i.e., the level of police intrusion permitted upon an anonymous report that a person is carrying a gun, is one that, unfortunately, recurs with frequency in our increasingly violent society. Since these cases frequently fall immediately on one side or the other of the line of demarcation between proper police action and unlawful search and seizure, seemingly similar fact patterns sometimes result in different outcomes and lead to confusion. It is somewhat ironic that it is the police officer who initially bears the heavy burden of analyzing the unfolding situation and making subtle distinctions in split seconds in order to determine what level of encroachment upon an individual's right to privacy is warranted. Nevertheless, since confrontation between police officer and citizen has been, and will remain, the fundamental intersection between the power of the State and the rights of the individual, each such encounter must be carefully scrutinized to insure that the legally protected liberty rights of the individual have not been improperly intruded upon by police

officers in the course of carrying out their important law enforcement obligations. *(People v Cantor,* 36 NY2d 106.)

In *People v De Bour* (40 NY2d 210), the Court of Appeals enunciated guidelines for assessing the propriety of police-initiated encounters with civilians based upon a four-tiered method of analysis ranging from a first-level minimal intrusion that is permissible for purposes of obtaining information where some articulable reason for doing so exists, to the fourth stage of an arrest by virtue of the existence of probable cause. This four-step framework was reaffirmed and clarified in *People v Hollman* (79 NY2d 181) and was further amplified in *People v Martinez* (80 NY2d 444), particularly with respect to the third level of intrusiveness by way of a forcible stop and seizure that takes place whenever an individual's freedom of movement is significantly impeded but is less than an arrest.

It is made clear in the foregoing cases that the underlying determinant of the appropriateness of police conduct is the quantum of knowledge which the officer possesses in relation to the specific level of interference with the individual's freedom of movement and that "[t]he greater the level of police interference, the greater the quantum of information necessary to justify it" *(People v Martinez, supra,* at 447). Making a determination as to whether the extent of the officer's intrusion was proper in a particular case is often complicated by the dynamics of an unfolding situation that provides incremental knowledge that may justify an escalating level of intrusiveness not initially warranted. The touchstone in each case is the reasonableness of the police conduct in light of the particular circumstances giving rise to the police intrusion at each stage.

Within that framework we turn to the facts of the instant case. Here, the report that the officer received from a person in the crowd that specifically and clearly identified defendant as the person claimed to be carrying a gun was sufficient to provide the officer with a reasonable suspicion that the defendant was committing a crime *(People v Salaman,* 71 NY2d 869; *People v Lindsay,* 72 NY2d 843, 844-845; *People v Russ,* 61 NY2d 693; *People v McLaurin,* 43 NY2d 902, *revg on dissent below* 56 AD2d 80, 84-85). Moreover, the reliability of the report was enhanced by the fact that it came from a citizen on the street with whom the officer had a face-to-face confrontation and who reported that he had actually seen the weapon in question *(People v Fernandez,* 182 AD2d 431, *lv denied* 79 NY2d 1049; *People v DeJesus,* 169 AD2d 521, 522, *lv*

*denied* 77 NY2d 994; *People v Castro,* 115 AD2d 433, 435, *affd* 68 NY2d 850).

Once the police officer possessed facts giving rise to reasonable suspicion of criminal activity on the defendant's part, he was entitled to stop the defendant and, since he additionally possessed "reliable knowledge of facts providing reasonable basis for suspecting that the individual to be subjected to that intrusion [was] armed and [might] be dangerous" *(People v Russ, supra,* at 695), he was also entitled to frisk him. In this context, we note that, under certain circumstances, even a reliable report that a person has been seen with a gun will not be sufficient to support a protective frisk when the officer also has information that the party involved is not at that point dangerous. *(See, e.g., People v Russ, supra* [frisk improper where police were told defendant had had a gun but had given it to someone else]; *People v Hernandez,* 179 AD2d 517, *lv denied* 79 NY2d 1002 [frisk improper where police were told defendant, although armed, was victim of crime].) In distinction, in this case, the report not only failed to contain such ameliorative information but, in fact, stated that the defendant had been "brandishing" the weapon, implying a degree of menace to his behavior. " '[W]here the report indicates that the person has used the weapon to menace or threaten or will use the weapon if stopped for questioning * * * then personal and public safety may well mandate a more intensive police intrusion.' " *(People v Bond,* 116 AD2d 28, 31, quoting *People v De Bour,* 40 NY2d 210, 225, *supra).* Moreover, the police conduct here must be evaluated in light of the exigent circumstance that crowds of people surrounded both the defendant and the officers, which created a substantial risk that any confrontation with the defendant might result in injury not only to the officers themselves but to innocent bystanders *(see, People v Taggart,* 20 NY2d 335, 340, *mot to amend remittitur granted* 21 NY2d 729, *appeal dismissed* 392 US 667). Under such circumstances, the officers were fully justified in protecting themselves and others.

■ Having found that the officers were in possession of sufficient information to justify stopping and frisking the defendant, we also find that the level of intrusion by the officers was in fact reasonably related to the information received from the bystander. We note in this context that there is a substantial degree of difference between police actions that will be upheld where only a limited frisk is warranted and those which require an adequate predicate to

support the full-blown search which is incident to an arrest pursuant to probable cause. Thus, particular types of behavior on the part of the police have been found to rise to a level of intrusiveness which requires a higher underlying predicate than the level of suspicion necessary to justify a simple pat down for weapons *(see, e.g., People v Francis,* 108 AD2d 322, 324 [report that defendant had gun did not support police response, which was "practically a full-blown search and seizure"]; *see also, People v Green,* 35 NY2d 193, 196 ["turning the defendant around by his arm for a pat down is not the same as a bear-hug grab from the rear"]; *People v Patterson,* 165 AD2d 673, *lv denied* 76 NY2d 989 [improper for police to immediately approach defendant with guns drawn, order him against the wall and conduct a full body frisk, pursuant to an anonymous report that defendant had accidentally dropped a gun and picked it up]). In this case, however, the officers' behavior was not only "reasonably related in scope" *(People v Cantor, supra,* at 111) to the information they possessed, but, indeed, appears to have been the least possible intrusive behavior warranted by the circumstances *(see, People v Salaman,* 71 NY2d 869, *supra).* In that regard, it is well established that the officer was entitled, as part of a limited protective pat down of the defendant, to feel the outside of the bag which the defendant carried on his person *(see, People v Brooks,* 65 NY2d 1021; *Matter of Mark Anthony G.,* 169 AD2d 89; *People v White,* 156 AD2d 741, *lv denied* 75 NY2d 971; *see also, Matter of Gregory M.,* 184 AD2d 252).

*People v Torres* (74 NY2d 224), relied upon by the hearing court, is not apposite to the facts before us. Since the defendant in that case had already placed his bag in his car and out of his reach when he was approached by the police, the Court concluded that once the defendant and his companion had been frisked outside the vehicle, there was no immediate threat to the safety of the officers, and no justification, at that point, for removal of the bag from the car. Here, in contrast, there was no question that the bag and its contents were immediately accessible to the defendant and " 'could be reached by the suspect during the brief face-to-face encounter' " *(supra,* at 230, quoting 1 La Fave & Israel, Criminal Procedure § 3.8 [e], at 309) putting at immediate risk both the police officers and innocent bystanders. Officer Ruiz's testimony that he had done no more than feel the bag when he was able to ascertain that it contained a gun, was fully credited by the hearing court. At that point, therefore, the

information available to the officer constituted probable cause to arrest, and he properly seized the bag.

In light of its decision to suppress both physical evidence and defendant's statements on the basis of the circumstances of defendant's arrest, the court did not reach the second branch of defendant's motion to suppress his statements on the grounds that he was interrogated without having been given *Miranda* warnings. We therefore remand for a determination on that aspect of defendant's motion.

Accordingly, the order of the Supreme Court, New York County (Murray Mogel, J.), entered November 19, 1991, which granted defendant's motion to suppress physical evidence and postarrest statements and the order of the same court, entered December 19, 1991, dismissing the indictment charging the defendant with criminal possession of a weapon in the third degree, should be unanimously reversed, the motion denied, the indictment reinstated and the matter remanded for a determination of defendant's motion to suppress his postarrest statements.

ROSENBERGER, J. P., KUPFERMAN and KASSAL, JJ., concur.

Order of the Supreme Court, New York County, entered November 19, 1991, which granted defendant's motion to suppress physical evidence and postarrest statements and the order of the same court, entered December 19, 1991, dismissing the indictment charging the defendant with criminal possession of a weapon in the third degree, are unanimously reversed, the motion denied, the indictment reinstated and the matter remanded for a determination of defendant's motion to suppress his postarrest statements.