*528 OPINION OF THE COURT
David Goldstein, J.
Upon defendant’s motion, the court conducted a combined Mapp/Huntley hearing, which was held on June 23, October 18, 20 and December 7, 1994. The People called three witnesses, Detective Maura Gentile, shield No. 3323, assigned to the Police Commissioner’s office, Police Officer James P. Graham, shield No. 12394, and Police Officer Michael Saxe, shield No. 6575, both assigned to the 113th Precinct. The defendant’s father, Michael Johnson, testified for the defendant. The court finds their testimony credible.
The court further finds that, on October 2, 1993, at approximately 1:20 a.m., Police Officer Saxe responded to a radio run of a male who had been shot in front of 155-33 114th Road. The radio report described the suspect as a male, Black, wearing a black jacket with a hood and blue jeans. Upon arriving at the scene, he found Derek Mitchell Moore, lying in the middle of the street, shot once in the head. There were 8 to 10 civilians who had approached Saxe and provided further information. They said that a black male shot a kid in the head and ran south on 157th Street. Saxe put the information over the air and questioned the witnesses further. Using his own body as a point of reference, he determined that the shooter was approximately five feet eight inches tall and weighed 140-150 pounds He was wearing a black hooded sweatshirt and blue jeans and ran north on 157th Street.
Officer Graham, while on patrol, overheard these radio reports. While in the vicinity of 156th Street and 113th Avenue, approximately three blocks from the shooting and six minutes after the original broadcast, Graham observed defendant, a male Black, six feet one inch tall and 185 pounds, leaning against an automobile, parked on the left side of the street. Defendant was wearing a dark blue hooded sweatshirt and blue jeans, and was the only male in the area. He had his hands in the pouch in the front of the sweatshirt, which sagged a little. Graham asked defendant to remove his hands from the pouch, which he did, at which point the officer noticed that the pouch sagged or drooped more and he observed a bulge. He reached and touched the area with his left hand and felt the cylinder of a gun and reached inside with his right hand, removed the gun and swung defendant around, placing him up against a car. A subsequent inspection of the weapon revealed four live rounds and one spent shell.
*529 Defendant was arrested and brought to the 113th Precinct. Detective Gentile arrived there at approximately 5:00 a.m. and interviewed defendant one hour later. She advised him of his Miranda warnings through the use of a printed rights form. Defendant acknowledged that he understood and agreed to waive his rights. He then wrote and signed a two-page statement. In substance, he stated that, at approximately 1:00 a.m., he had telephoned his girlfriend near a store on Sutphin Boulevard. As he was talking, he found a gun, wiped dirt from it and put it into his sweatshirt. Five or 10 minutes later, he heard sirens. After a police car stopped him, an officer grabbed his clothing and found the gun.
Defendant was taken to the precinct, where he was interviewed by Detective Gentile at approximately 6:00 a.m. She advised him of his Miranda rights and, after acknowledging that he understood and agreed to questioning, he wrote a two-page statement. In substance, he stated he was with two friends, Kendra and Joann. At about 1:00 a.m., Kendra gave him some change so he could make a telephone call. He called his girlfriend and, after seeing the gun, started playing with it, and, eventually, wiped dirt from it and put it into his sweatshirt. While he was waiting for a taxi to take him home, he heard sirens. His friend decided to see what was happening but, because of the gun, he stayed. Subsequently, the police arrived and told him that he fit the description of a male with a gun. When they grabbed his clothing, they found the gun.
Defendant remained in the precinct as Detective Gentile investigated his statement. She interviewed Kendra and another female, Fergus, and received accounts inconsistent with that of defendant. At approximately 2:00 p.m., Detective Gentile returned to the precinct and advised defendant as to the inconsistencies. He responded that part of his original story was wrong and that he was prepared to write what had actually happened.
He then wrote a second two-page statement. In substance, this statement indicated that, at 1:00 a.m., he was talking to Joann when his beeper went off. After she gave him change, while he was dialing, a white car pulled up. The driver reached for something, took out what appeared to be a gun and sped away. Defendant chased the vehicle and, eventually, the driver exited the automobile with a bag. He dropped it and reached into his coat. Defendant then pulled out his gun and pulled the trigger, causing the driver to fall in the street. *530 After returning to Joann’s house, defendant came outside to wait for a cab, whereupon the police approached and, since he fit the description of someone with a gun, they frisked him and found the weapon. This statement, as well as the first, were signed by defendant, Gentile and another officer.
The applicable legal standard for judging the propriety of police conduct in street confrontations with private citizens is set forth in People v De Bour (40 NY2d 210), and was reaffirmed in People v Hollman (79 NY2d 181). De Bour delineated four levels of permissible police intrusion, the propriety of each depending upon the circumstances presented. The various levels of permissible police intrusion must be "reasonably related in scope to the circumstances which rendered its initiation permissible” (People v De Bour, supra, at 215).
The first level authorizes a police officer to approach to request information where there is "some objective credible reason * * * not necessarily indicative of criminality” (People v De Bour, supra, at 223). The questioning should be brief and specific, relating, for example, to an inquiry as to the person’s identity, destination or reason for being in the area (see, People v Hollman, supra, at 191).
However, once the officer’s questioning becomes accusatory and the inquiry focuses upon the possibility of criminality, the stop passes beyond a mere request for information and to the second level, the common-law right to inquire. This level, which goes beyond a simple request for information, "is activated by a founded suspicion that criminal activity is afoot” (People v De Bour, supra, at 223). The questioning may be invasive and of an accusatory type, which would lead a person to reasonably believe that he is the focus of an investigation (People v Hollman, supra, at 191-192). Under this level, the officer may interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure.
The third level permits an officer to forcibly stop and detain a person for questioning where the police officer has reasonable suspicion that a suspect has committed, is committing, or is about to commit a crime. Reasonable suspicion has been defined as that "quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand” (People v Cantor, 36 NY2d 106, 112-113). The right to stop is a limited seizure and permits a significant interruption of a person’s liberty of movement (People v Cantor, supra). Included is the statutory *531 right to frisk if the officer reasonably suspects himself to be in danger of physical injury by virtue of the detainee being armed (CPL 140.50 [3]).
The fourth and final level authorizes a police officer to arrest and take one into custody where the officer has probable cause to believe that the person has committed a crime or an offense in his presence (CPL 140.10).
Naturally, any determination of the permissible level of police intrusion necessitates a searching examination of the facts and circumstances surrounding the encounter. In our case, when Officer Graham approached defendant, he possessed sufficient facts to provide a reasonable suspicion that defendant had committed a crime and, therefore, was entitled to forcibly stop and detain him (see, People v De Bour, supra, at 223). The requisite suspicion was predicated upon two factors, the information received from Officer Saxe and his own personal observations. As noted, when Saxe approached the crime scene, he was met by approximately 8 to 10 people from whom he was able to glean a description of the suspect and the direction he had run. Obviously, a crime had been committed, as evidenced by the body in the street. Just as obvious, contrary to defendant’s argument, the citizens who described the shooter and his route of escape were eyewitnesses to the crime. In the haste of the moment, arriving at the scene of a homicide, with witnesses vocalizing descriptions of the suspect and his possible location, it is understandable that Saxe would not specifically ask if they had observed the shooting, nor is it unusual that he did not ascertain the identity of each of the informants. Unlike the situation where an anonymous caller reports a crime and gives a description, Officer Saxe had the opportunity to ascertain that a crime had been committed and could assess the reliability of the informants on the basis of their appearance and demeanor, factors which are crucial to any such assessment (see, People v Castro, 115 AD2d 433, 435; People v Bruce, 78 AD2d 169, 173). Noteworthy, too, is the fact that there is no evidence that the witnesses attempted to conceal their identities but, as Saxe explained it, he "was busy getting a patrol supervise [sic], getting descriptions on the air and getting the guy to the hospital. I didn’t have time to get names and addresses or anything like that.” (Hearing transcript, Saxe, Dec. 7, 1994, at 18.)
Officer Graham heard the broadcasts from Saxe, whom he knew and recognized by voice. He observed defendant some six *532 minutes after the initial broadcast and three blocks north of the homicide. He was wearing a dark hooded sweatshirt and was leaning against a parked vehicle. Although defendant argues that Saxe never described the pants that the suspect was wearing, he did indicate that the original report indicated blue jeans. While Graham testified that Saxe did describe the pants, he may have heard the description of blue jeans in the initial radio report. In view of the time of night and the fact that he was the only person in the area who matched the description, the officers did act in a reasonable fashion in stopping defendant. Inasmuch as he was leaning against a parked vehicle, his height was not a critical factor, since it was not readily ascertainable. Likewise, considering the time of day that the homicide occurred, it is not significant that the sweatshirt was described as dark or dark blue or black.
Several factors, including the short passage of time between the homicide and the stop, the close proximity of the suspect to the site of the crime, the fact that defendant was the only person in the area who matched the description and the fact that he was perspiring, as if he had been running, support the conclusion that the police did possess reasonable suspicion to forcibly stop defendant (see, People v Greene, 195 AD2d 619; People v Thomas, 195 AD2d 489; People v Chin, 178 AD2d 423, lv denied 79 NY2d 945; People v Harris, 175 AD2d 713; People v Tromp, 160 AD2d 750).
The more intrusive frisk of a subject, stopped on the basis of reasonable suspicion, is justified if the officer "reasonably suspects that he is in danger of physical injury” (CPL 140.50 [3]). In addition to observations at the scene, the officer may be justified in frisking a suspect based upon the nature of the crime which had been reported. Thus, a radio report of an armed robbery in progress, at a specified location, with a specific description, would justify a forcible seizure of a suspect, and a protective pat down, in view of the officer’s reasonable belief that the defendant might be armed (see, People v Salaman, 71 NY2d 869; People v Jackson, 205 AD2d 640; People v Cartagena, 189 AD2d 67, lv denied 81 NY2d 1012). Here, the report of a homicide by a shooting would reasonably permit the police to infer that a defendant who had been detained, shortly after the incident and in close proximity to it, might be concealing a deadly weapon. Thus, for their own safety, the pat down and subsequent seizure of the gun was proper in this case.
Defendant’s reliance upon People v Parris (83 NY2d 342) is *533 misplaced. In Parris, two police officers, Small and Lopez, responding to a burglary, were met at the scene by another police unit, one of whom advised that the next door neighbor had given a detailed description of the perpetrator, who fled on a bicycle before the police arrived. The description was repeated to Small and Lopez, who arrested defendant. They were the only witnesses who testified at the suppression hearing. In reversing defendant’s conviction, the Court of Appeals held that, while the People were not required to produce the officer who had imparted the information to the arresting officer, they failed to establish how the neighbor had come upon this information. There was no testimony as to the factual basis for the neighbor’s belief that the person he described as the burglar resulted from his personal observation of him actually entering or leaving the premises, or otherwise. Thus, the basis of knowledge prong, required under the Aguilar-Spinelli test (Aguilar v Texas, 378 US 108; Spinelli v United States, 393 US 410), was not satisfied.
In our case, however, Officer Saxe, who actually spoke to the witnesses, did testify. Although his testimony was somewhat sparse with respect to what the witnesses observed, the following colloquy is contained in the record:
"Q. Did any person there say they actually saw the shooting happen?
"A. Everybody was basically saying the guy that shot him—
"Q. No, I’m asking you a different question.
"the court: You can finish your answer.
"Q. Did you specifically ask anyone did you see the shooting?
"the court: You can finish your answer before counsel interrupted you.
"A. The guy that shot him ran that way wearing a black hood.” (Hearing transcript, Saxe, at 16.)
Notwithstanding that he was not as articulate as one may have wished, it appears that Saxe was told by 8 to 10 people that at least some had observed the shooting and were able to provide a description of the suspect and his direction of flight. Thus, unlike Parris (supra), the basis of knowledge prong was satisfied here.
Insofar as the statements are concerned, although an incorrect date appears on one of the confessions, the credible evidence indicates that both statements were written and *534 signed the very same day. The court further finds that defendant was properly advised of his constitutional rights and that he knowingly, intelligently and voluntarily waived them.
Accordingly, the motion to suppress the statements and the physical evidence is denied in all respects.