[607 NYS2d 270]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v DAVID
KADAN, Respondent.

First Department, February 1, 1994

## APPEARANCES OF COUNSEL

*Susan Gliner* of counsel, New York City *(Robert M. Raciti* with her on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*Michael Fred Baum,* Brooklyn, for respondent.

## OPINION OF THE COURT

SULLIVAN, J. P.

This is an appeal by the People from the suppression of a gun recovered from defendant, indicted on one count of criminal possession of a weapon in the third degree, as well as statements which he subsequently made to the police. The pretrial hearing disclosed the following facts.

At about 8:22 A.M. on March 3, 1992, Police Officer King, in uniform and assigned to a foot post in the Long Island Rail Road section of Pennsylvania Station, was entering the men's room on the Seventh Avenue Concourse as part of his detail, when he was approached by a commuter who told him that he had just seen two males in a bathroom "packing crack vials." When asked what he meant, the man replied, "you know what I mean, they had crack vials." The commuter described one of the men as wearing blue pants and a black jacket, the other as wearing a leather jacket with the American flag depicted on the back. At the officer's request that he point out the two men, the commuter pointed out defendant and Brian Cook, wearing the same articles of clothing as he had previously described, in front of the temporary main waiting room. The commuter, on his way to work, refused to assist Officer King any further.

The officer then followed defendant and Cook around the station. Both men acted "very suspicious"; they kept looking over their shoulders, "walk[ing] around in a nervous kind of fashion." When they noticed a sign displaying a police emblem in front of the police district office on the Seventh Avenue Concourse, they turned around and walked the other way. At

that point, Officer King called for assistance and was joined by Officer DeNatalie. The two officers then approached defendant and Cook and asked for identification. The two became nervous; Cook, in particular, began to "shake and stutter in speech and * * * turned a white shade of color," while defendant began to walk away. Defendant returned as directed. When Cook reached into his right front pocket for identification he pulled out assorted papers and money, including a New York State driver's license, as well as two crack vials. Since a crowd was beginning to form the officers decided to take both Cook and defendant to the district office.

Inside the office, Officer King searched Cook and recovered seven more crack vials and a crack pipe from Cook's right front pocket. Meanwhile, Officer DeNatalie noticed a bulge in defendant's front waistband and recovered a loaded .32 caliber automatic handgun. The officer placed defendant under arrest. After receiving and expressing his understanding of the *Miranda* warnings, defendant stated that he was not willing to answer questions without an attorney present.

A few minutes later, defendant asked Officer DeNatalie if he could "talk to [him] for a second." The officer indicated that he could and uncuffed defendant, who then asked, "Who is in more trouble, me or the other guy." Defendant then explained that he and Cook had been out drinking the night before, "got a little drunk and decided to come into the city." Defendant explained that he had purchased the gun for $40 or $50 in a pawn shop in Alabama when he was in the military police. Defendant, who planned to take the Suffolk County police test, wanted to know if there was "anything I can do to get out of this."

Both defendant and Cook testified. Defendant admitted that as the two waited in Pennsylvania Station for a train to return to Long Island after a night of drinking, he was carrying, in the front waistband of his pants, a loaded .32 caliber automatic handgun, for which he had a pistol permit in Alabama but none in New York. Cook stated that he had purchased drugs on the street earlier that morning and that he was in possession of crack vials. As defendant waited across the hallway from the men's room, Cook alone proceeded to a bathroom stall, closing the door, and took out the crack vials in his pocket to separate the empty vials from those that still had crack in them. After Cook exited the men's room the two proceeded to look for the track from which their train was to

depart. As they were looking, they were stopped by two police officers who asked for identification. After both produced identification, the officers, who told Cook that he looked "wired", asked him if he "was holding anything." When Cook said "no," the officers asked him to empty his pockets. Cook removed everything except the crack vials. One of the officers then touched Cook's pocket and asked him to remove the contents. Cook removed the vials of crack and handed them to the officer. With that, the officers brought both Cook and defendant to the police station. As soon as defendant walked into the police station, one of the officers asked him if he had anything on him. Defendant answered, "No." A search revealed the gun. Defendant also confirmed that the conversation testified to by Officer DeNatalie was the one they had.

The hearing court found that, based on the "citizen" tip, the officers legitimately approached defendant to request identification. When Cook pulled out two crack vials from his pocket, the commuter's report was corroborated and the "level of permissible intrusion increased." Thus, the request to accompany the officers to the district office for further investigation was reasonable. Although "substantially credit[ing]" the police testimony, while finding the testimony of defendant and Cook to be "self-serving and evasive" in several respects, the hearing court nonetheless found Officer DeNatalie's account as to what he had done once he noticed the bulge in the area of defendant's front waistband to be "inconsistent." Characterizing the officer's demeanor as "spontaneous and forthright" as he testified to his observation of a bulge and immediate reach into defendant's waistband, the court found that the gun had been recovered prior to any pat-down. From that factual premise, it concluded the officer's conduct was impermissible in the absence of testimony that he had conducted a pat-down and felt a hard object or that he otherwise feared for his safety. Accordingly, the court suppressed the gun. In addition, although finding that defendant's statements were spontaneous and voluntary, the court suppressed them because they were made only after and as a result of the illegal seizure of the gun. We reverse.

While the suppression court correctly found that the police were justified in stopping defendant and Cook and taking them to the nearby police district office, it erred when it determined that Officer DeNatalie could not properly seize the gun once he observed the bulge in defendant's waistband merely because he did not first conduct a pat-down. By the

time Officers King and DeNatalie brought defendant to their district office, they already had probable cause to arrest him.

A citizen informant had initially approached Officer King and informed him that he had just seen two men "packing" crack vials in the bathroom. Although King did not ascertain the informant's name, he had the opportunity to assess his credibility on the basis of his demeanor and the accuracy of his information. *(See, People v Harris,* 175 AD2d 713, 715, *lv denied* 79 NY2d 827; *see also, People v Cartagena,* 189 AD2d 67, *lv denied* 81 NY2d 1012.)* The informant, a commuter on his way to work, provided a detailed physical description of the two men and agreed to accompany the officer to the waiting room where he identified defendant and Cook, whose appearance coincided precisely with the description he had just given Officer King. *(See, e.g., People v Hetrick,* 80 NY2d 344.)*

Moreover, the suspicious behavior of defendant and Cook once Officer King placed them under observation tended to confirm the commuter's report. Both men, according to King, appeared nervous and were looking over their shoulders. When they noticed the sign displaying a police emblem outside the police district office, they stopped immediately and turned in a different direction. The commuter's report was corroborated when King stopped defendant and Cook and asked for identification. As even the hearing court conceded, King had the right to make the stop based on the commuter's report and his own observations. Once stopped, both defendant and Cook displayed a consciousness of guilt. Cook turned white and began shaking and stuttering. Defendant attempted to walk away. It is clear that these facts are sufficient to provide King with a reasonable suspicion that defendant had committed a crime. *(See, People v Harris, supra; People v Cartagena, supra.)*

Quite apart from this suspicious behavior, probable cause was definitively established when Officer King observed Cook pull out two crack vials from his pocket as the latter produced identification. This was "conduct suggestive of, or directly involving, the criminal activity" related to him and provided instant confirmation of the commuter's report. *(People v Elwell,* 50 NY2d 231, 241.)

Thus, the hearing court's determination that Officer DeNatalie could not immediately reach for the object he saw bulging from defendant's waistband is flawed since it failed to

recognize that the officers already had probable cause to arrest defendant and Cook when they brought them to the district office. The officers could have searched defendant and Cook in the station as an incident to a lawful arrest. *(People v Smith,* 59 NY2d 454, 458.) Thus there was no need for Officer DeNatalie to pat the bulge in defendant's waistband or, for that matter, to rely on his observation of the bulge at all to justify his recovery of the weapon. Inasmuch as the hearing court suppressed defendant's statements solely because they were the result of an illegal seizure, having found that they were otherwise spontaneous and voluntary, the statements are properly admissible at trial.

Accordingly, the order of the Supreme Court, New York County (Renee A. White, J.), entered on or about July 31, 1992, granting defendant's motion to suppress a gun recovered from him and certain statements made by him to the police, should be reversed, on the law, and the motion denied.

Asch, Rubin and Nardelli, JJ., concur.

Order, Supreme Court, New York County, entered on or about July 31, 1992, reversed, and the motion to suppress denied.